# United States Court of Appeals
## For the First Circuit

No. 17-1872

MEDICAL MUTUAL INSURANCE COMPANY OF MAINE,

Plaintiff, Appellee,

v.

DOUGLAS BURKA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Barron, Circuit Judges.

Christopher C. Dinan, with whom Monaghan Leahy, LLP was on brief, for appellant.
Christopher C. Taintor, with whom Norman, Hanson & DeTroy, LLC was on brief, for appellee.

August 10, 2018

**LIPEZ**, **Circuit Judge**.    Appellant Douglas Burka, a physician, is the defendant in a pair of civil suits filed in state courts in Maine and Maryland.    Following Burka's request for a defense from his professional liability insurer, appellee Medical Mutual Insurance Company of Maine ("MMIC"), MMIC brought this declaratory judgment action seeking to establish that it has no duty to defend Burka in either state proceeding.    At the core of the coverage dispute are allegations that Burka improperly accessed his wife's medical records during their deteriorating, and ultimately failed, marriage.    In the state-court complaints, Burka's now ex-wife, Allison Cayne, claims that Burka used his status as a doctor to obtain her records so he could harass and embarrass her.[1]

The district court granted the declaratory judgment for MMIC, concluding that the claims against Burka in both lawsuits fell outside the professional liability coverage provided by the MMIC policy ("the Policy").    After close review of the Policy and the state-court complaints, we agree with that determination and, hence, affirm.

---

[1] In the Maryland action, Cayne's parents also are plaintiffs, and they likewise allege that Burka improperly accessed their medical records.

- 2 -

Under Maine law, which the parties agree governs this case, "[w]hether an insurer owes a duty to defend is a question of law that we review de novo." City of S. Portland v. Me. Mun. Ass'n Prop. & Cas. Pool, 158 A.3d 11, 13-14 (Me. 2017) (footnote omitted). To answer that question, a court must "consider[] and compare[] two documents: the insurance policy and the underlying complaint against the insured." Harlor v. Amica Mut. Ins. Co., 150 A.3d 793, 797 (Me. 2016). The duty to defend arises if that comparison, with "the complaint[] read broadly in conjunction with the policy, reveals the existence of any legal or factual basis that could potentially be developed at trial and result in an award of damages covered by the terms of the policy." Id.

Burka argues on appeal that the district court erred in finding no duty to defend the Maryland and Maine lawsuits because accessing medical records, as he was alleged to have done, constitutes a "professional service" within the scope of the Policy's coverage. He insists that the plaintiffs' allegations of malicious intent are irrelevant to the coverage issue. He further asserts that coverage is at least debatable, and he is therefore entitled to a defense, because the Policy's definition of "professional services" is ambiguous.

Given the centrality of the Policy and the state-court complaints to the resolution of this case, we begin by describing

- 3 -

those documents.  In doing so, we borrow liberally from the district court's helpful description of their contents.  To set the stage, and explain why lawsuits were filed in two states, we note that Burka and Cayne moved from Tennessee to Maine in 2013 and, in 2015, as their marriage was collapsing, they both relocated independently to Maryland.  Cayne's parents are longtime residents of Maryland.

## A. The Maryland and Maine Lawsuits

In February 2016, Cayne and her parents filed a complaint against Burka and his father, Dr. Steven A. Burka, in Maryland state court.  The complaint alleges, in relevant part, that both during his marriage to Cayne and after their separation around April 2015, Douglas Burka "engaged in a campaign to access Allison's medical records to learn about her mental and gynecological health and other confidential medical information." Maryland Compl. ¶ 14.  Specifically, the complaint alleges that Burka conspired with his father in the spring of 2015 to improperly access Cayne's medical records at hospitals in the Washington, D.C. area for the purpose of harassing and embarrassing her and to gain advantage in their pending divorce litigation.  Id. ¶ 15. The complaint also alleges Burka's improper access to the medical records of Cayne's parents for the same purposes.  Id. ¶ 18.

- 4 -

The Maryland complaint refers to allegedly improper actions taken by Burka in Maine in only one paragraph, which states in full:

> Before and after their separation, Douglas Burka engaged in a campaign to access Allison's medical records to learn about her mental and gynecological health and other confidential medical information. Upon information and belief, Douglas Burka first used his privileges at Vanderbilt [in Nashville] to access Allison's mental health records without authorization in or about July of 2011, when Allison was in therapy at Vanderbilt. Upon information and belief, on at least one occasion, after Allison left him, Douglas Burka also used his privileges at Southern Maine Medical Center to access Allison's medical records. He also accessed her email accounts and social media accounts without authorization on several occasions after Allison left him. These incidents are the subject of a separate lawsuit in Cumberland County Superior Court in Maine, *Burka v. Burka*, No. 16-CV-20.

Maryland Compl. ¶ 14.

In Maine, the operative amended complaint was filed in May 2016, alleging in relevant part that Burka had accessed Cayne's medical records "at Southern Maine Healthcare" without authorization while he was employed as a doctor in that practice during the spring of 2015. Maine Compl. ¶¶ 1, 15-16. Although the complaint does not specifically identify Cayne as a patient of an SMHC doctor or the practice, that status is an inevitable inference from the allegations that Burka accessed her confidential healthcare information maintained there.

The amended Maine complaint seeks a remedy on three grounds. The First Claim for Relief (invasion of privacy) was dismissed by the state court and the Third Claim for Relief (intentional infliction of emotional distress) was dismissed by stipulation of the parties, leaving only the Second Claim for Relief alleging unlawful disclosure of confidential health care information. For that claim, Cayne requests injunctive relief and costs based on a Maine statute protecting the "[c]onfidentiality of health care information." Me. Rev. Stat. Ann. tit. 22, § 1711-C.[2]

**B. The MMIC Policy**

The Policy identifies SMHC Physician Services, P.A. ("SMHC") as the named insured,[3] and it includes a "Slot Policy

---

[2] Section 1711-C prohibits disclosure of "[a]n individual's health care information" by "the health care practitioner or facility," with specified exceptions. Me. Rev. Stat. Ann. tit. 22, § 1711-C(2). The statute's "Enforcement" provision states, in part:

> An individual who is aggrieved by conduct in violation of this section may bring a civil action against a person who has intentionally unlawfully disclosed health care information . . . . The action may seek to enjoin unlawful disclosure and may seek costs and a forfeiture or penalty . . . .

Id. § 1711-C(13)(B).

[3] The district court noted its understanding that Southern Maine Health Care, referenced in Cayne's complaints, is the sole shareholder of SMHC Physician Services, P.A. and also has operated under the name of Southern Maine Medical Center. Med. Mut. Ins.

Endorsement" that extends coverage to "all individual physicians listed on the SCHEDULE OF SLOTS ENDORSEMENT and working as employees or contractors of the NAMED INSURED." The policy's Declarations Page labels the document as "A Modified Professional Liability Policy -- Claims Made -- for Physicians and Surgeons," and the policy itself is labeled "Physicians Comprehensive Professional Liability Insurance Policy." Burka was listed by name on the "Schedule of Slot Coverage," and it is undisputed that he was a covered physician between August 13, 2012 and August 25, 2015.

The Slot Policy Endorsement includes the following coverage agreement:

> Coverage afforded to insured physicians under this Policy is limited to CLAIMS arising from MEDICAL INCIDENTS or from NON-PATIENT INCIDENTS which result from their PROFESSIONAL SERVICES rendered within the scope of their duties as a physician employee or contractor of the NAMED INSURED . . . .

The coverage agreements of the Policy state, in pertinent part:

> A. MEDICAL INCIDENT Liability
>
> We agree to pay on your behalf DAMAGES and DEFENSE COSTS which you become legally obligated to pay due to any CLAIM made against you as a result of a MEDICAL INCIDENT as defined in this Policy . . . , provided that:

Co. of Me., No. 2:16-cv-462-GZS, 2017 WL 3725980, at *2 n.2 (D. Me. Aug. 29, 2017). We have no need to distinguish among these entities and use "SMHC" to refer to Burka's Maine practice group.

1. the MEDICAL INCIDENT results from your PROFESSIONAL SERVICES . . . .

B. NON-PATIENT INCIDENT Liability

We agree to pay on your behalf DAMAGES and DEFENSE COSTS which you become legally obligated to pay due to any CLAIM made against you as a result of a NON-PATIENT INCIDENT as defined in this Policy . . . , provided that:

1. the NON-PATIENT INCIDENT results from your PROFESSIONAL SERVICES . . . .

The Policy provides relevant definitions as follows:

A. "CLAIM" means an oral or written demand against an INSURED for DAMAGES, and includes civil lawsuits . . . .

B. "DAMAGES" means monetary sums not exceeding the Limit of Liability for which you are legally obligated to pay (including pre-judgment interest) to compensate for injury or death as a result of a MEDICAL INCIDENT . . . or as a result of a NON-PATIENT INCIDENT . . . .

E. "INSURED" means any individual or organization listed as the NAMED INSURED or as an Additional INSURED on the DECLARATIONS PAGE or on an Endorsement to this Policy. Other individuals or organizations might also be INSUREDS if they qualify as such under the Policy's Section III. INSUREDS.[4]

F. "MEDICAL INCIDENT" means any act, failure to act, or omission in the furnishing of PROFESSIONAL SERVICES to a PATIENT by any INSURED. . . . .

---

[4] Section III sets out four categories of "INSUREDS." Of pertinence here is subsection C, which includes as insureds "employees of the NAMED INSURED, but only for PROFESSIONAL SERVICES rendered within their scope of duties as such."

H. "NON-PATIENT INCIDENT" means an occurrence other than a MEDICAL INCIDENT which arises from PROFESSIONAL SERVICES provided by an INSURED and which results in a CLAIM for DAMAGES. . . . .

I. "PATIENT" means any person for whom any INSURED under this Policy directly performs PROFESSIONAL SERVICES in the form of healthcare treatment of that person. . . . .

The Policy's definition of "professional services" is of particular significance to the parties' contentions, and we therefore reproduce it in full:

J. "PROFESSIONAL SERVICES" means an INSURED's:

1. healthcare services to a PATIENT performed in the practice of physician or surgeon, including the furnishing of food or beverages, the furnishing or dispensing of medical supplies or appliances and the handling and postmortem examinations of human bodies;

2. services as a member of a hospital's or professional society's formal accreditation, peer review, credentialing, privileging, standards review or similar board or committee, including executing the directives of such board or committee;

3. obligation to maintain PATIENT confidentiality in the handling of PATIENT records in the direct course of providing PROFESSIONAL SERVICES to that PATIENT;

4. writing of books, papers, and articles relating to the technical aspects of medical practice if the same are published or distributed by a recognized technical or professional publisher, academic or professional journal, or professional or technical society or association.

- 9 -

PROFESSIONAL SERVICES do not include your billing and coding activities; therefore, there is no coverage for any CLAIM arising out of such activities. PROFESSIONAL SERVICES also do not include physical or electronic security measures designed to maintain the confidentiality of PATIENT records or any other records in the control of an INSURED; therefore, there is no coverage for CLAIMS based on actual, possible or alleged identity theft arising from your failure to adequately implement such security measures.

## II.

### A. The District Court Proceedings

MMIC filed the operative amended complaint in this action in November 2016, seeking a declaration that it does not have a duty to defend Burka in the Maryland and Maine lawsuits. Burka subsequently moved for partial summary judgment, asking for the opposite declaration -- i.e., that MMIC does have a duty to defend him in the two lawsuits.[5] MMIC moved to defer the court's ruling on Burka's motion so that the company could conduct discovery on whether Burka was covered by the Policy when he allegedly accessed Cayne's medical records. Alternatively, MMIC asked for summary judgment in its own favor.

The district court issued two separate rulings on MMIC's declaratory judgment claim. In its initial ruling, the court held that MMIC had no duty to defend the Maryland action, noting that

---

[5] Burka had filed a counterclaim requesting that declaration, and he also sought an award of attorney's fees incurred in defending the underlying actions.

it could "discern no potential for coverage under the Policy." Med. Mut. Ins. Co. of Me. v. Burka, No. 2:16-cv-462-GZS, 2017 WL 1743505, at *5 (D. Me. May 3, 2017) ("Burka I"). The court observed that the claims in the Maryland action are not based on Burka's conduct in Maine, and the Policy covers only "professional services" furnished by physicians working within the scope of their duties for SMHC. Id. Although the court acknowledged "some ambiguity in the definition of 'professional services' in the Policy," it concluded that "there is no potential that facts will be developed at trial that would connect Dr. Burka's provision of 'professional services' under the Policy, however that term is defined, with the alleged conspiracy to access Allison's medical records at Washington, D.C.-area medical facilities seemingly unaffiliated with SMHC at a time when Allison was no longer living in Maine." Id.[6]

With respect to the Maine lawsuit, the court held that MMIC had no duty to defend going forward because the Policy limits the defense obligation to claims for damages, and the only remaining cause of action -- based on the Maine statute -- did not include damages as a remedy. See supra note 2 (quoting Me. Rev.

---

[6] The district court also noted its understanding that Burka did not "seriously contend that the allegations in the Maryland suit concerning Howard and Caroline Cayne, Allison's co-plaintiffs and parents, are sufficient to trigger a duty to defend." Burka I, 2017 WL 1743505, at *5 n.8.

Stat. Ann. tit. 22, § 1711-C(13)(B)). However, the court held that it could not yet determine whether Burka was entitled to coverage for his defense costs for the period before the claims seeking damages were dismissed. Burka I, 2017 WL 1743505, at *6 n.10. Accordingly, the court granted partial summary judgment for MMIC, holding that it "does not have a duty to defend the Maryland suit and does not have a duty to defend the Maine suit to the extent it only states a claim under 22 M.R.S.A. § 1711-C(13)(B)." Id. at *7.

In response to the court's ruling, Burka filed a motion for amendment and/or clarification, which the court treated as another motion for partial summary judgment -- this time addressing the question of whether the insurer ever had a duty to defend the Maine suit. Med. Mut. Ins. Co. of Me. v. Burka, No. 2:16-cv-462-GZS, 2017 WL 3725980, at *4 (D. Me. Aug. 29, 2017) ("Burka II"). In its decision on that motion, the court again observed that the Policy's definition of "professional services" is imperfect -- deeming it "circular in that it includes the term 'professional services.'" Id. at *5. Nonetheless, the court said it "cannot divine, without resorting to undue speculation, reading allegations in or out of the Complaint, or ignoring the intention of the parties as expressed in the Policy's clear language, how Allison's claims in the Maine suit arose 'in the furnishing of' or

- 12 -

'in the direct course of providing' her professional services."

Id.

> The court explained its conclusion, in part, as follows:
>
> > Simply put, there is no ambiguity that the provision of professional services is a central component of any covered claim. Further, any common understanding of "professional services" would not encompass a physician maliciously and surreptitiously accessing a patient's medical records for the sole purpose of harassing, threatening, or embarrassing that patient based on a spousal relationship.

Id. The court thus held that MMIC "never had a duty to defend the Maine suit." Id.

## B. Contentions on Appeal

Burka's challenge to the district court's judgment rests primarily on two propositions: (1) under Maine law, the duty to defend is extremely broad, and (2) "professional services" as defined in the Policy embraces a meaning that could cover the allegations in the complaints. Burka maintains that the court improperly focused on allegations in the state-court complaints concerning improper motivation to conclude that there was no potential for any of Cayne's claims to fall within the Policy's coverage. Asserting that his motivation is irrelevant, Burka states that "coverage turns on Allison's allegations that [he] intentionally accessed her medical records without her permission and that she suffered damages as a result." He emphasizes that

the Policy's definition of "professional services" reflects an "intent to provide coverage for claims related to the handling of a patient's confidential records."  Because "[t]hat is <u>precisely</u> the claim made against [him]," Burka asserts, "[t]he duty to defend is obvious."

Moreover, Burka argues, any uncertainty about coverage should have been resolved in his favor because Maine law gives wide scope to the duty to defend and also directs that ambiguities in insurance policies be construed in favor of the insured.  Hence, given that the district court found the definition of "professional services" to be ambiguous, he argues that the Policy should be construed to cover both the Maryland and Maine actions because both allege harm from his flawed performance of an explicitly covered professional task: "maintain[ing] confidentiality in the handling of patient records."

MMIC counters that the district court's reading of the complaints and the Policy was on target: MMIC has no duty to defend either state lawsuit because the underlying pleadings do not seek to impose liability for conduct by Burka that even potentially occurred "in the direct course of providing [the Caynes] PROFESSIONAL SERVICES" or within the scope of his duties as an employee of SMHC.

## III.

We can readily agree with Burka that Maine employs an expansive concept of the duty to defend. See, e.g., Barnie's Bar & Grill, Inc. v. U.S. Liab. Ins. Co., 152 A.3d 613, 615 (Me. 2016) ("We have consistently applied a broad construction of the underlying complaint in favor of the insured and a strict construction of policy exclusions and ambiguities against the insurer."). Despite its breadth, however, the duty to defend in Maine is not unbounded. The Maine Supreme Judicial Court has cautioned against reading its "body of case law" to "oblig[e] courts to conjure the duty to defend from speculation or supposition." Id.

Determining coverage thus requires a realistic application of the "comparison test," in which the court "examine[s] the underlying complaint for any potential factual or legal basis that may obligate the insurer to defend the insured, even the mere 'intent to state a claim within the insurance coverage.'" Id. at 616 (quoting Lavoie v. Dorchester Mut. Fire Ins. Co., 560 A.2d 570, 571 (Me. 1989)) (emphasis and citation omitted). In making that examination, the court may neither "read extrinsic facts or allegations into an underlying complaint" nor "selectively read facts or allegations out of that complaint in order to conclude that the insurer has a duty to defend." Id. at 616-17.

We consider it undisputed in this case that coverage -- and thus the duty to defend -- turns on whether Burka's alleged access to the Caynes' medical records could potentially fall within the Policy's definition of "professional services." That is so because the Slot Policy Endorsement, which extends the Policy to named physicians, states that coverage is provided for claims arising from incidents that "result from [the covered physicians'] PROFESSIONAL SERVICES rendered within the scope of their duties as a physician employee or contractor of" SMHC. No other Policy provision broadens the coverage beyond "professional services," and, indeed, the Policy is identified as a "Physicians Comprehensive <u>Professional Liability</u> Insurance Policy." (Emphasis added.)

Hence, to answer the coverage question -- and thus to determine whether MMIC has a duty to defend -- we must consider whether the allegations reveal "any potential factual or legal basis," <u>Harlor</u>, 150 A.3d at 797, for concluding that Burka's actions "result from . . . PROFESSIONAL SERVICES rendered within the scope of [his] duties as a physician employee or contractor of" SMHC. As we shall explain, we agree with the district court that a sensible reading of the Policy, together with a fair reading of the complaints, does not permit such a conclusion. We begin with our interpretation of the Policy and then review why the allegations fall outside the scope of its coverage.

## A.  Reading the Policy

Burka's allegedly improper access to, and use of, the Caynes' medical records would be covered under the Policy, if at all, within the category of "professional services" that the Policy describes as the "obligation to maintain PATIENT confidentiality in the handling of PATIENT records in the direct course of providing PROFESSIONAL SERVICES to that PATIENT."  This description appears as one of four types of "professional services" listed within the definition of that term.

We acknowledge the poor drafting of the Policy in defining "professional services."  A definition that uses the term that is being defined -- i.e., defining "professional services" as maintaining confidentiality in providing "professional services" -- is far from ideal.  In context, however, the circularity in the definition does not beget ambiguity.  The Policy makes clear that the confidentiality obligation covers only records relating to <u>patient</u> interactions because that term is used three times in the confidentiality provision to define and limit the coverage.  In addition, the phrase "in the direct course of providing PROFESSIONAL SERVICES" specifies that the confidentiality obligation exists only in relation to one or more of the four listed professional services covered by the Policy. Only two items on the list involve patients: "healthcare services" and the confidentiality obligation.  But we cannot reasonably conclude

- 17 -

that the confidentiality provision covers itself -- i.e., that the Policy covers an insured for breaching the obligation to maintain confidentiality in the handling of patient records in the direct course of providing [the professional service of] maintaining confidentiality in the handling of the patient's records. Such a reading would be nonsensical.

In context, then, the reference to "PROFESSIONAL SERVICES" in the confidentiality provision necessarily refers only to the other professional service provided to patients -- i.e., healthcare services -- despite the Policy's failure to say so expressly. In addition, the definition of "professional services" ties the covered confidentiality obligation to the physician's provision of healthcare services to the particular patient whose medical records are at issue. Put another way, a physician's alleged breach of confidentiality is covered if it arises "in the direct course of providing [healthcare services] to that PATIENT" -- i.e., the patient alleging the breach. (Emphasis added.)

The Policy's definition of "patient" confirms that a doctor-patient relationship is an essential component of the confidentiality obligation. Under the Policy, a "PATIENT" is "any person for whom any INSURED . . . directly performs PROFESSIONAL SERVICES in the form of healthcare treatment of that person." The Policy's definitions thus describe a covered claim of improper disclosure of medical records (implicating the professional

- 18 -

service of maintaining confidentiality) as one in which the alleged mishandling occurs "in the direct course" of the insured's carrying out the professional service of "healthcare treatment." By definition, then, whether an alleged breach of confidentiality is covered depends on whether the accused doctor has treated the complaining patient.

The Slot Policy Endorsement, the portion of the Policy that expressly extends coverage to individually named physicians, confirms this reading of the definitions and coverage. The relevant portion of the Endorsement limits coverage to "CLAIMS arising from MEDICAL INCIDENTS . . . which result from [the covered physicians'] PROFESSIONAL SERVICES rendered within the scope of their duties as a physician employee or contractor of the NAMED INSURED."[7] A "MEDICAL INCIDENT," pursuant to the Policy's definitions, occurs "in the furnishing of PROFESSIONAL SERVICES to a PATIENT." And, as we have ascertained, when the professional service underlying the "incident" is the obligation to maintain the confidentiality of medical records, the conduct at issue must have occurred "in the direct course" of a patient's treatment.

---

[7] The omitted text refers to "NON-PATIENT INCIDENTS." In his opening brief, Burka states that it does not matter whether Cayne was Burka's patient because "the policy covers incidents both with patients and non-patients." As detailed above, however, the confidentiality obligation applies only to patients.

We thus find no ambiguity in the scope of coverage for claims based on the "professional service" of "maintain[ing] PATIENT confidentiality in the handling of PATIENT records." The only reasonable interpretation of the Policy's provisions is that an insured's alleged mishandling of patient records is covered only if that behavior occurred "in the direct course" of the insured's provision of healthcare services to the patient claiming the breach. See State Farm Mut. Auto. Ins. Co. v. Montagna, 874 A.2d 406, 408 (Me. 2005) ("When the . . . policy is interpreted as a whole, it is not reasonably susceptible to different interpretations, and therefore it is not ambiguous.").

In his brief on appeal, Burka does not fully reject this understanding of the Policy's terms. Although he at times appears to suggest that the Policy should be construed to cover the "mishandling of patient records" by any insured physician at SMHC -- whether or not that physician is the particular patient's own provider[8] -- he elsewhere acknowledges the necessary tie between a doctor's confidentiality obligation and the doctor-patient relationship. He points out that under both the Maine and Maryland

_____

[8] This contention is implied, for example, in the following statements from Burka's brief (with our emphasis added): "It appears that Allison, a patient of an insured, is alleging that Dr. Burka, a covered insured physician, mishandled her confidential patient records. If proved, Allison's allegations could potentially give rise to coverage under the MMIC Policy."

statutes governing disclosure of health care information, "evidence is required that the claimants were patients of Dr. Burka," and he subsequently reiterates that "the required proof for the critical claims is solely mishandling of medical records by the claimants' doctor." (Emphasis added.) He then observes: "The relevant aspects of the proof needed to establish the underlying claims, in short, precisely match the coverage provided relative to the 'obligation to maintain patient confidentiality in the handling of patient records.'" In other words, this final statement declares that the Policy's coverage "match[es]" the proof required by the statutes, which he previously described as including a showing that "the claimants were patients of Dr. Burka."

Notwithstanding this depiction of the Policy as requiring a doctor-patient relationship, Burka falls back on his assertion of ambiguity in the "professional services" provision to argue that the scope of coverage in any event remains elusive and that, accordingly, the Policy must be construed in his favor. He acknowledges that whether the Caynes' allegations add up to a covered "medical incident" (per the Slot Policy Endorsement) depends on whether the alleged accessing of their records was committed in the furnishing of "professional services." But the latter term, he maintains, is ambiguously defined, and the insurer therefore has a duty to defend against the claims.

As our discussion above reveals, a close review of the Policy terms belies the contention of ambiguity in the definition of professional services or the Policy's coverage for claims premised on the mishandling of patient records. Accordingly, moving from the Policy to the complaints, the coverage question becomes whether the allegations in the complaints present "any potential factual or legal basis" for a finding that Burka improperly accessed or disclosed Cayne's records at SMHC in the direct course of providing her healthcare services. Barnie's, 152 A.3d at 616 (emphasis omitted). The question is not whether Cayne was a patient of any doctor at SMHC, but whether Burka's alleged mishandling of records stemmed from his own provision of healthcare services to her.

## B. Reading the Complaints

### 1. The Maryland Complaint

Like the district court, we can discern no potential basis in the Maryland complaint for coverage under the Policy, which is limited to Burka's conduct within the scope of his employment at SMHC. The sole reference to Burka's actions in Maine is contained in paragraph 14, reproduced in full above. See Section I.A. The complaint offers no details concerning that conduct, instead seeming to present the information -- including the fact that "a separate lawsuit" was filed in Maine -- solely as background. By contrast, the subsequent paragraphs detail Burka's

alleged actions in accessing the Caynes' records within the Johns Hopkins Health System ("JHHS"), whose hospitals are located in Maryland and Washington, D.C.  The complaint's four counts allege violations of Maryland statutory law, common law (invasion of privacy, civil conspiracy, and intentional infliction of emotional distress), and the federal Health Insurance Portability & Accountability Act.

Given the unelaborated statements relating to Maine, and the specificity of the allegations concerning access to JHHS records, paragraph 14 is only reasonably read to say that the asserted access to records in Maine is covered by a different lawsuit and not the Maryland action.  In any event, there would be no coverage for any Maine-based conduct in the Maryland action for the same reasons, discussed below, that Burka is not entitled to a defense in the Maine action.  Accordingly, we agree with the district court's determination that the Policy does not entitle Burka to a defense in the Maryland action.

### 2.  The Maine Complaint

As described above, the allegations in the Maine complaint unquestionably would permit a factual finding that Cayne received medical care at SMHC and that Burka was covered by the Policy at the time he allegedly accessed her medical records there. The question remains, however, whether the allegations offer "any potential factual . . . basis" for a finding that Burka's alleged

mishandling of Cayne's records occurred "in the direct course of" his provision of healthcare services to Cayne at SMHC.

We see no such possibility in the complaint. The pleading does not merely omit any reference to a doctor-patient relationship between Burka and Cayne; its allegations directly contradict a professional association between them. We note, in particular, Cayne's assertion that Burka's actions involved unauthorized <u>access</u> to her medical records in Maine and improper disclosure to himself. The allegation that Burka was not entitled even to see her records leaves no room for a factual finding that he was involved in her medical treatment. Indeed, the complaint depicts his actions as solely animated by his personal objectives. Accordingly, the complaint unequivocally places Burka's alleged improper access to, and disclosure of, Cayne's medical records outside the Policy's coverage.[9]

Burka's contention that the district court erred by highlighting the Maine complaint's allegations of bad faith is

---

[9] To the extent Burka is suggesting that we must construe Cayne's complaints to potentially allege a doctor-patient relationship because the statutes she invokes require such a relationship, we reject that assertion. The legal sufficiency of her complaints is a separate issue from whether the comparison test reveals a duty to defend under the Policy. <u>See</u> <u>Mitchell</u> v. <u>Allstate Ins. Co.</u>, 36 A.3d 876, 879 (Me. 2011) ("An insurer may have a duty to defend even against a complaint that could not survive a motion to dismiss."). And here, as we have explained, the complaint's express allegations do not leave room for an inference of a doctor-patient relationship. To be clear, we note that we offer no view on the scope of either state statute.

thus off the mark. It is true, as Burka points out, that a violation of Maine's medical-records confidentiality provision does not require a showing of maliciousness, and the trial of such a claim therefore need not "involve discussion of the alleged access being malicious or surreptitious." But Burka goes beyond the bounds of the Policy when he suggests that a potential for coverage exists without regard to the context in which he accessed his ex-wife's records.

Burka insists that a determination of no-coverage would be at odds with forty years of Maine precedent, in which the vast majority of all duty-to-defend disputes have been resolved in favor of the insured. He reports that in nearly all of the cases in which no duty was found, the alleged conduct fell within an unambiguous policy exclusion. He cites, for example, Barnie's Bar & Grill, where the Maine Supreme Judicial Court held that the insurer had no duty to defend a bar in an action brought by a patron who had been injured by another bar customer. See 152 A.3d at 614. The court reasoned that all of the claims were based on assault and battery, and the policy expressly excluded such claims. See id. at 616-17; see also, e.g., York Golf & Tennis Club v. Tudor Ins. Co., 845 A.2d 1173, 1177 (Me. 2004) (finding no duty to defend a complaint seeking a remedy for slander because the policy excluded coverage for libel and slander claims). Burka draws from this precedent the proposition that, "unless [a claim is]

specifically excluded, the insurer owes its insured a defense." He asserts that, because there is no applicable policy exclusion here, and "critical aspects of the policy language are ambiguous," he is entitled to a defense.

The imbalance in the number of cases finding a duty to defend as compared to those that find no duty does not, however, give rise to the principle Burka extracts from the disparity. An applicable exclusion is one way to negate the duty-to-defend, but allegations also may simply fall outside a policy's affirmative coverage. See, e.g., Harlor, 150 A.3d at 799 (noting the need to determine if a complaint's allegations potentially provide a basis for damages resulting from an "occurrence" within the meaning of the insurance policy); Gibson v. Farm Family Mut. Ins. Co., 673 A.2d 1350, 1353 (Me. 1996) (finding a duty to defend a claim exposing the insureds to damages for a loss "within the policy definition of 'property damage' resulting from an unintentional act within the policy definition of an 'occurrence'"). Indeed, the Maine Supreme Judicial Court's directive against "conjur[ing] the duty to defend from speculation or supposition" hints at a concern that its broad doctrine is susceptible to over-extension. Barnie's Bar & Grill, 152 A.3d at 615. Put simply, the obligation to resolve doubts in favor of the insured does not mean that courts should make generalized assumptions in favor of coverage. Each case requires particularized scrutiny, and "the comparison test is

limited to the language of the underlying complaint and the insurance policy."  Id. at 616.

In this case, that comparison reveals no potential for coverage.  To reiterate our conclusion, under the affirmative terms of the Policy, coverage depends on whether the allegedly improper access to, and disclosure of, Cayne's medical records occurred in the course of professional services -- specifically, healthcare services -- provided by Burka to Cayne.  The duty to defend Burka thus requires a relationship of doctor to patient that is emphatically denied by the complaint's allegations and, hence, could only be "conjure[d] . . . from speculation or supposition."  Id. at 615; see also id. at 616 ("Except in rare circumstances, we will not consider facts extrinsic to the underlying complaint nor will we read allegations into the complaint in determining whether the insurer has a duty to defend." (citation omitted)).

We therefore conclude that MMIC is not obligated to defend Burka in the Maine action.

**IV.**

Having found that MMIC has no duty to defend Burka in either the Maryland or Maine proceedings, we affirm the district court's summary judgment in MMIC's favor.

So ordered.

- 27 -